D. D. HAIRSTON et al., Appellants,

v.

George RICHIE et al., Appellees.

No. 16100.

Court of Civil Appeals of Texas.

Fort Worth.

July 15, 1960.

Rehearing Denied Sept. 16, 1960.

**264**

Geo. W. Anderson and Stayton M. Bonner, Wichita Falls, for appellants.

Anderson, Latham & Castledine, and Steve Latham, Wichita Falls, for appellees.

BOYD, Justice.

George Richie and Irene Richie, formerly husband and wife, sued D. D. Hairston and L. D. Fox, Jr., individually and as partners, doing business as Fox-Hairston Construction Company, Hairston Lumber Company, Kenneth Myers, Billy Hammonds, Glen Fox, and Travis Fox, for an accounting, for partition, and for debt, alleging that George Richie was a partner in Fox-Hairston Construction Company, and that the money and property sued for belonged to their community estate. There was a verdict, and judgment was rendered for plaintiffs, it being decreed that they recover from Hairston, L. D. Fox, Jr., and Kenneth Myers, as partners in Fox-Hairston Construction Company, the sum of $23,268.76, with interest, as well as certain interests in notes and real estate, and from Hairston individually the sum of $3,085.57. From this judgment Hairston, L. D. Fox, Jr., and Myers appeal.

By their first group of points appellants contend that it was not shown who all the partners in Fox-Hairston Construction Company were, and that it was error to render judgment against Hairston, L. D.

Fox, Jr., and Myers for the title to and possession of real estate in Altus, Oklahoma, and ordering them to pay debts on such property, "since such judgment does not affect the title any of the other Defendants may have in said property and does not order any of the other Defendants to pay such debts on the property as may be owed by them." It is also contended that it was error to refuse a new trial "since said judgment did not dispose of all the issues and all of the parties."

Appellees alleged that Myers, Hammonds, Glen Fox, and Travis Fox were not partners as of October 31, 1956, the date when George Richie withdrew from the partnership, and that they did not know whether they were now partners, but that Hairston and L. D. Fox, Jr., alleged that the named defendants were partners, and appellees asked that they be made parties so they could set up whatever claim they might have in the partnership, or in the partnership funds or property.

It appeared that Hairston owned Hairston Lumber Company individually, and the jury found that George Richie was a partner in Fox-Hairston Construction Company. There was evidence that Myers was a partner in the Construction Company. No issue was submitted or requested as to the status of Hammonds, Glen Fox, or Travis Fox. Since no judgment was rendered against any of them, we think it is presumed that the court found that they were not partners, and disposed of them by implication. Daniel Lumber Co. v. Settlemire, Tex.Civ.App., 256 S.W.2d 922; Rule 272, Texas Rules of Civil Procedure. These points are overruled.

On agreement of the parties, the court appointed an auditor under Rule 172, T.R.C.P., to "make a full and complete audit of all of the books and records of the Fox Hairston Construction Company as of October 31st, 1956, showing all of the assets and liabilities and profits of such business; * * *." The auditor filed a comprehen-

sive report, to which some exceptions were filed by the parties. A material part of appellees' recovery was based on evidence and findings of the jury under their exceptions to the report, involving the matter of salary and expenses claimed by George Richie in addition to his interest in the assets of the partnership. Richie contended that he was entitled to a salary of $75 per week from March, 1952, until October 31, 1956, the date on which he withdrew from the partnership, $50 per week expenses during that time, and $125 per week from October 31, 1956, to August 2, 1957, and five per cent of the profits of Hairston Lumber Company for 1955 and the first ten months of 1956.

In his report the auditor said: "In the beginning, I would advise the Court that the accounting records of Fox-Hairston Construction Company, for the period covered by this audit, were poorly conceived, poorly kept, wholly inadequate, and were devoid of most of the hallmarks of reliability. * * * To attempt to determine the profit earned by this Company for any single year or from any particular project would be an impractical and futile undertaking." He computed the profits by "The Net Worth Method," taking the net worth at the beginning of the period and the net worth at the end, and adding amounts withdrawn by the partners. The report showed that Richie had withdrawn $49,637.42, and his finding on the matter of salary was: "I am unable to determine from the books whether or not any part of the amounts charged above to Richie should have been charged to expense as salary or wages."

By a group of points appellants say that the court erred in submitting issues inquiring whether Richie "was to have been credited on the books with a salary" after March, 1952, and prior to October 31, 1956; whether he "was to have received $50.00 per week expenses" and for what period of time; whether he "was to have received a salary" after October 31, 1956, how much he was to have received, and for what pe-

riod of time; and what amount Richie "was entitled to receive" as commissions from Hairston Lumber Company for the first ten months of 1956. The jury found that he was "to have received credit" for $75 per week as salary from March, 1952, to October 31, 1956; $50 per week as expenses during that period; that he was "to have received" a salary of $125 per week from October 31, 1956, to August 2, 1957; and that he was "entitled to receive" $2,292.38 from Hairston Lumber Company for 1956. Appellants' objections to these issues were that they could solve no issue in the case, the ultimate issues being whether appellants agreed to pay Richie a salary and expenses, and what were the profits of Hairston Lumber Company and that there was no evidence, and no sufficient evidence, to support the jury's answers.

Before Richie became a partner he drew a salary during the building of two houses and was also paid one-third of the profits. With the exception of the months of March, April, and May, 1956, we think there was evidence of probative force that appellants agreed to pay him a salary for the disputed periods, and expenses as found by the jury, and that the findings were not so against the weight of the evidence as to be clearly wrong. Richie testified that he began work under the partnership agreement in June, 1952.

On the question of salary and expenses from March, 1952, to October 31, 1956, we set out the substance of Richie's testimony: the partners were to "share and share alike in the profits. * * * And from time to time we were to get traveling expenses and monies to maintain our livelihood while we were in operation. * * * We didn't draw a salary as such, we didn't get credit for a salary"; he was to get a "draw" each week, $75 to live on and $50 was for traveling and other expenses.

"Q. Were you supposed to get credit of $75.00 as a salary or not? A. I was supposed to get credit for that as a salary. * * *

"Q. And the $75.00 you have testified you were supposed to get credit as a salary for that? A. Yes, sir." He was spending his full time on the work; a portion of his withdrawals of $49,637.42 should be credited to him as salary and expenses.

"Q. And the $125.00 a week should have been applied against salary and overhead rather than against your drawing shouldn't it? A. Yes, sir." It was agreed before he "went over there" that he was to have a salary and expense check of $125 per week.

In his deposition Richie testified that he did not draw a salary after the Tole job. He said, "There was no salary." After the partnership was formed, he said, he got from twenty to twenty-five per cent, but no salary. On the witness stand he testified that he did not mean to say in his deposition that he was not to get credit for a salary, but meant to say that he did not "draw" a salary. Some of the checks to Richie were signed by himself. Some were marked "Draw," but none was marked "Salary." He said he was told that if the books showed too many salaried employees the firm would be liable for Workmen's Compensation payments.

Testimony by D. D. Hairston at a former trial was introduced as follows:

" 'Q. Now during all this time was Mr. Richie on any kind of a salary? A. From the lumber yard?

" 'Q. Yes, sir. A. No, sir.

" 'Q. How about the construction company? A. Yes, sir. * * *

" 'Q. Have you given in this audit, Mr. Richie, any credit for salary and expenses that he was to draw this $125.00 a week? A. It is in the audit and on the books I don't know how it was written up. * * *

" 'Q. But your agreement was that he was to receive a salary wasn't it, it started off at $60.00 a week didn't it? A. Well that was on some, maybe jobs.

" 'Q. And then it grew to $75.00 a week when his jobs took him more time didn't it? A. Well it was raised I don't remember just when or how much.

" 'Q. To $75.00 per week salary plus $50.00 a week expense account and that made $125.00 a week didn't it, isn't that right? A. Yes, sir.' "

L. D. Fox, Jr., testified that: after the Tole job, which was prior to the formation of the partnership, Richie "never was to draw any more salary"; he drew a salary in 1951 and a portion of 1952; "The books were changed to fit our agreement that there would be no salary. * * * There was no one had any authority to pay him a salary"; all the partners agreed that no one should draw or receive credit for a salary.

"Q. State whether or not he was ever entitled to draw any salary or did draw any salary after the Ira Tole job? Mr. Castledine: We object to that as being a conclusion whether he was entitled to or not, it is what the agreement was. The Court: Sustain the objection. * * * Was he ever paid a salary after the Ira Tole job? A. No, sir.

"Q. Was it ever agreed that he should receive a salary after the Ira Tole job? A. No, sir."

■■■ We think the better practice would have been to submit these issues in the form suggested by appellants. But it is not in every case that an erroneous charge requires a reversal. In Texas Employers Ins. Ass'n v. McKay, 146 Tex. 569, 210 S. W.2d 147, 149, it was held that, viewing the charge as a whole, an issue which assumed that the plaintiff in a compensation case had suffered an injury was not such error as " ' * * * was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case * * * '. Rule 434, Texas Rules of Civil Procedure."

Moreover, this was an accounting case, and the matters in controversy were submitted to an auditor. His report was conclusive as to all items not excepted to. Boggs v. State, 46 Tex. 10; Moore v. Waco Bldg. Ass'n, 19 Tex.Civ.App. 68, 45 S.W. 974; Dwyer v. Kaltayer, 68 Tex. 554, 5 S.W. 75. Appellees' burden was to vary the auditor's statement of the account. We do not think the form of the issues was such as was reasonably calculated to or probably did mislead the jury to the prejudice of appellants.

In addition to objections to the form of the issues as to whether Richie "was to have received a salary after October 31, 1956," appellants say there is no evidence, and the evidence is insufficient, to support the finding that Richie was to have received a salary of $125 per week after the termination of the partnership.

On this point Richie testified: "Q. All right sir. Now after the partnership was dissolved as of October 1956 did you make any arrangements concerning any salary and expenses that you were to draw? * * * I am asking you, my question to you please is did you make any arrangements as to drawing any salary or expenses at that time? A. Yes.

"Q. How much was that? A. Well it was agreed between Mr. Hairston and myself that I would get $125.00 a week and that within a short time we would have all this business straightened up. * * * Did you work for them during that time? A. Yes, sir, I was out there probably five or six more months after that.

"Q. Until when? A. Until November of 1957." Appellants say that the payments received by Richie after October 31, 1956, were made because Hairston and Fox thought the Company still owed Richie some money, Richie testified that Hairston and Fox had some work commitments and "were planning to start them and they needed to be started and there was some things around the yard that needed to be done about getting this straightened up.

"Q. Is that the reason you stayed on the payroll after you say the partnership was terminated? A. That's the only reason I know of. * * *

"Q. And you were helping them perform their business were you not? A. I was trying to yes, sir." At one point Richie said the agreement was that he should have $75 per week salary and $50 per week expenses, whereas the jury found that the salary was $125 per week and that he was not to receive any expenses, and that therefore the finding of $125 per week salary is contrary to Richie's testimony. "Salary" is recompense for services, and is synonymous with "allowance." Webster's New International Dictionary. Richie said he was to get $125 per week. We think it immaterial whether what he received is called salary or wages, or neither or both. The jury chose to believe Richie's version of the matter, and the evidence is sufficient to support the finding.

Richie was entitled to five per cent of the profit of Hairston Lumber Company for 1955 and the first ten months of 1956. The profit for 1955 was $44,597.02. Richie testified that he, Hairston, and the Lumber Company's bookkeeper computed from the books that the profit for the first ten months of 1956 was $45,847.50. This was to some extent corroborated by reproduced testimony of Hairston at a former trial. The Company's auditor testified that the profit for the entire year was $16,372.47, and appellants say that Richie was entitled to only five per cent of that amount. The auditor did not determine what the profit was to October 31, 1956, or whether the Company lost money during the last two months. The jury found that Richie was entitled to $2,292.38 for the period; and in this state of the record we think that finding is amply supported.

Richie had no interest in the Sunnyside Heights project, which was carried out in

1952. The jury found that no profit was made on it. Appellants say that this finding has no support, and that the proceeds of the sales of those houses, including at least $21,000 in profits, were deposited in the Construction Company's bank account and considered by the court's auditor in calculating Richie's interest in the partnership funds. The auditor said he did not determine where the funds in the account came from, but if there were any profits from that project, they were included in his audit. Richie was in the partnership during at least the last seven months of 1952, working on other projects in which he had an interest. He testified that so far as he knew the proceeds of the sales in that project were deposited in the firm's bank account. L. D. Fox, Jr., testified that all such proceeds were deposited in that account including a net profit of "$21,000.00 plus." An auditor for the Company, who was the Company's bookkeeper at the time, testified that the profit on that project was "about $23,000.00," and went into the bank account. He said he was familiar with the expenditures made in connection with the Sunnyside project and with the income derived from the sale of the houses. Fox testified that the deposit tickets could not be found, but the bank statements were introduced, showing large deposits, and it was undisputed that the firm was not making sales from other projects at that time. We think appellants' point is well taken and that the statement of the court's auditor of the amount of Company assets in which Richie had an interest should be decreased by $21,000.

In arriving at the net worth of the Company at the end of the audit period, the court's auditor did not consider a list of "unproved payables" totaling $30,530.56, which appellants contend was owed by the firm to Hairston Lumber Company. The auditor said he could not determine whether these charges were correct without auditing the books of the Lumber Company, and he was forbidden by the court's order to make that audit. He also said if these items were valid payables, then they would reduce the Company's net worth by that amount. Appellants had the books of the Lumber Company audited, and that auditor testified that all the items were owed by the firm to the Lumber Company. In making the audit, he examined the charge tickets, invoices, statements, and receipts from the Construction Company, and he said that the entire amount of $30,530.56 was properly chargeable against the partnership. There being no evidence to the contrary, we think the jury's finding that none of the items was owed by the firm is without support in the evidence. The net worth of the Company as found by the court's auditor should accordingly be decreased in the sum of $30,-530.56.

■■ Another point is that it was error to render judgment for interest from October 31, 1956, the date the partnership was terminated, because there was neither pleading nor proof to sustain it. We think this point is well taken. Appellees prayed for judgment for debt and for their interest in the partnership properties, and for general relief. It has been held that where the date when money should have been paid is reasonably determined from the evidence, interest may be allowed from that date under a prayer for general relief. Trevathan v. G. M. Hall & Son, Tex.Civ.App., 209 S.W. 447. On the other hand, the general rule seems to be that no interest is allowed on partnership accounts prior to the time when an accounting is had and the balance is ascertained, unless an accounting has been delayed through misconduct or fraud. Corralitos Co. v. Mackay, 31 Tex. Civ.App. 316, 72 S.W. 624. Appellees alleged that appellants, upon the termination of the partnership, took possession of the books, records, and assets of the partnership and "have refused, and still refuse, to divide and partition said property"; but there is no allegation as to when such refusal took place, and no evidence as to when or whether appellees demanded an accounting. Such being the situation, we cannot say that the court impliedly found the

requisite facts to support a judgment for interest from a date prior to the trial.

We have carefully considered the other points briefed by appellants, but believe they fail to reflect error.

The judgment is modified by eliminating from appellee's recovery interest before the date of trial; and by reducing the judgment against the partners in the following amounts: $1,625 representing 13 weeks salary and expenses for March, April, and May, 1952; $5,250, being one-fourth of $21,000 profit from Sunnyside Heights addition project; and $7,632.64, being one-fourth of the $30,530.56 payables owing by the partnership. In all other respects the judgment is affirmed.

The costs of the appeal are adjudged against appellees.